REDACTED PUBLICLY FILED VERSION

# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS
### WACO DIVISION

|  |  |
|---|---|
| XOCKETS, INC., <br>                Plaintiff, <br><br> vs. <br><br> NVIDIA CORPORATION, MICROSOFT CORPORATION, and RPX CORPORATION, <br>                Defendants. | Case No.: 6:24-cv-453-LS |

## MEMORANDUM OF RPX CORPORATION
## IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ...........................................................................................................1

ARGUMENT ................................................................................................................................5

    I.      Legal Standard ................................................................................................................5

    II.    Plaintiff Does Not Show a Likelihood of Success on the Merits ..................................5

          A.    PLAINTIFF FAILS TO PROVIDE EVIDENCE OF A
                 CONSPIRACY UNDER SECTION 1 OF THE SHERMAN ACT ..................6

          B.    PLAINTIFF FAILS TO SHOW ANY LIKELIHOOD OF SUCCESS
                 ON ITS SHERMAN ACT SECTION 2 CLAIM .............................................16

          C.    THERE IS NO EVIDENCE PLAINTIFF SUFFERED ANTITRUST
                 INJURY .........................................................................................................17

          D.    PLAINTIFF FAILS TO SHOW IRREPARABLE HARM ...........................18

          E.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST
                 WEIGHS AGAINST A PRELIMINARY INJUNCTION ..............................19

CONCLUSION ............................................................................................................................20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abraham & Veneklasen Joint Venture* v. *Am. Quarter Horse Ass'n*,
    776 F.3d 321 (5th Cir. 2015) ................................................................................6, 8

*Acad. of Allergy & Asthma in Primary Care* v. *Quest Diagnostics, Inc.*,
    2022 WL 980791 (W.D. Tex. Mar. 31, 2022) .........................................................16

*Apani Sw., Inc.* v. *Coca-Cola Enter., Inc.*,
    300 F.3d 620 (5th Cir. 2002) .................................................................................13

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007) ...............................................................................................6

*Big Tyme Invs., L.L.C.* v. *Edwards*,
    985 F.3d 456 (5th Cir. 2021) ...................................................................................5

*Broad. Music, Inc.* v. *Columbia Broad. Sys., Inc.*,
    441 U.S. 1 (1979) .............................................................................................12, 14

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ..............................................................................................17

*Cascades Computer Innovation LLC* v. *RPX Corp.*,
    2013 WL 6247594 (N.D. Cal. Dec. 3, 2013) ..........................................................15

*Cascades Computer Innovation, LLC* v. *RPX Corp.*,
    719 F. App'x 553 (9th Cir. 2017) .....................................................................15, 18

*Commonwealth Sci.* v. *Buffalo Tech. Inc.*,
    492 F. Supp. 2d 600 (E.D. Tex. 2007) ...................................................................19

*Dennis Melancon, Inc.* v. *City of New Orleans*,
    703 F.3d 262 (5th Cir. 2012) ...................................................................................5

*Golden Bridge Tech., Inc.* v. *Motorola, Inc.*,
    547 F.3d 266 (5th Cir. 2008) ...................................................................................6

*Gordon* v. *N.Y. Stock Exch., Inc.*,
    422 U.S. 659 (1975) (Douglas, J., concurring) .......................................................20

*Interox Am.* v. *PPG Indus., Inc.*,
    736 F.2d 194 (5th Cir. 1984) .................................................................................18

*Kjessler* v. *Zaappaaz, Inc.*,
    2019 WL 3017132 (S.D. Tex. Apr. 24, 2019) ........................................................10

*Matsushita Elec. Indus. Co.* v. *Zenith Radio*,
    475 U.S. 574 (1986) ...............................................................................................17

*MM Steel, LP* v. *JSW Steel (USA), Inc.*,
    806 F.3d 835 (5th Cir. 2015), *cert. denied*, 137 S. Ct. 372 (2016) ........................11

*Monsanto Co.* v. *Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) .................................................................................................6

*NYNEX Corp* v. *Discon, Inc.*,
    525 U.S. 128 (1998) ...............................................................................................16

*Proofpoint, Inc.* v. *Boone*,
    2021 WL 5194724 (W.D. Tex. Sept. 21, 2021).................................................19, 20

*Stewart Glass & Mirror, Inc.* v. *U.S. Auto Glass Disc. Centers, Inc.*,
    200 F.3d 307 (5th Cir. 2000) .............................................................................16, 17

*Texaco Inc.* v. *Dagher*,
    547 U.S. 1 (2006) ...................................................................................................11

*Texas* v. *Seatrain Int'l, S. A.*,
    518 F.2d 175 (5th Cir. 1975) ...................................................................................5

*Union Carbide Corp.* v. *UGI Corp.*,
    731 F.2d 1186 (5th Cir. 1984) ...............................................................................20

*United States* v. *Gen. Motors Corp.*,
    384 U.S. 127 (1966) ...............................................................................................11

*United States* v. *U.S. Gypsum Co.*,
    438 U.S. 422 (1978) ...............................................................................................12

*Viazis* v. *Am. Ass'n of Orthodontists*,
    314 F.3d 758 (5th Cir. 2002) ...............................................................................6, 7

**Statutes**

7 Areeda & Hovenkamp, *Antitrust Law*, ¶1508, p. 368 (5th ed. 2023) ...................11, 12

**Other Authorities**

*Antitrust Guidelines for the Licensing of Intellectual Property*, DOJ and FTC at
    16-17 (Jan. 12, 2017) ...............................................................................................9

Letter from Joel Klein, Acting Ass't Att'y Gen., U.S. Dep't of Justice, to Garrard
    Beeney, Partner, Sullivan & Cromwell LLP on behalf of The Trs. of
    Columbia Univ. et al. (June 26, 1997) at 15-16,
    https://www.justice.gov/sites/default/files/atr/legacy/2006/10/17/215742.pdf ........................9

Letter from Makan Delrahim, Ass't Att'y Gen., U.S. Dep't of Justice, to Mark
    Hamer, Partner, Baker & McKenzie, on behalf of Avanci LLC (July 28, 2020)
    at 8-9, https://www.justice.gov/atr/page/file/1298626/dl?inline ...........................................10

Letter from Michael F. Murray, Acting Principal Deputy Ass't Att'y Gen., U.S.
    Dep't of Justice, to Garrard Beeney, Partner, Sullivan & Cromwell LLP on
    behalf of UTLP (Jan. 13, 2021) at 5,
    https://www.justice.gov/atr/page/file/1352961/dl?inline ......................................................10

*Robert Cote on Xockets, Inc. Lawsuit Against Nvidia, Microsoft, RPX Corp.,*
    BLOOMBERG'S "THE CLOSE," (Sept. 24, 2024) available at
    https://www.xockets.com/media ...............................................................................................20

*RPX FAQs*, RPX: RATIONAL PATENT, https://www.rpxcorp.com/faqs (last visited
    Oct. 9, 2024) ..........................................................................................................................2, 3

RPX: RATIONAL PATENT, https://www.rpxcorp.com (last visited Oct. 9, 2024) ...........................7

*Xockets Timeline*, XOCKETS: DATA PROCESSING UNITS,
    https://www.xockets.com/our-story ............................................................................................3

## PRELIMINARY STATEMENT

Declining to pay what a seller demands when the seller demands it is not a violation of law. Plaintiff insisted that RPX offer to buy or license Xockets, Inc.'s ("Xockets's") patents for ███████████ in less than one month's time. When RPX—having evaluated Plaintiff's patents in the ██████████████—noted that no deal of the magnitude Xockets required could be done in such a short period and asked for more time, Xockets filed this case.

RPX *never* refused to make an offer to Xockets and never had an agreement with anyone that they would not make an offer to Xockets. In fact, RPX told Xockets that RPX was willing to further explore a deal, but RPX could not meet the ridiculous time and price constraints Xockets set. Now, instead of taking responsibility for its own failed negotiating strategy and admitting that the market did not value its patents at anything near what Xockets claimed, Xockets is trying to force through litigation what it could not achieve through arm's-length negotiations.

In fact, it was Xockets that attempted to take advantage of the RPX business model it now challenges as a violation of law. But Xockets has not stated a claim for relief, much less met the test for a preliminary injunction. There is no evidence or even plausible inference of an agreement not to bid on the Xockets patents or that RPX would be the exclusive bidder. The evidence confirms the contrary. RPX's sensible and justified business decision to follow its normal due diligence process and evaluate Xockets's offer as it would any other offer does not in any way comprise an antitrust violation, and there is no competent evidence to the contrary. RPX respectfully requests that this Court deny Plaintiff's Motion for a Preliminary Injunction ("Motion" or "Mot.").

## STATEMENT OF FACTS

**RPX CORPORATION.** RPX was founded over 16 years ago to create efficiencies in the licensing of intellectual property ("IP") and minimize the risk of costly and distracting

REDACTED PUBLICLY FILED VERSION

litigation for its members ("Members") and patent owners through RPX's strategic licensing and acquisition of patents. (McCurdy Decl. ¶¶4–6.) To create these efficiencies, RPX analyzes patent portfolios; purchasing, in its sole discretion, patent rights that would otherwise pose litigation risks to its Members; and RPX passes on those rights to Members in exchange for its Members' annual membership fee. (*Id.* ¶¶6–7.) In all its years of operation, the RPX model has never been questioned by any antitrust authority and never held to violate any law by any court in any jurisdiction. Its services are purely optional to patentees and prospective licensees alike, and its business has successfully concluded thousands of licenses to the satisfaction of those electing to use its services.

Unlike tangible property, which can be withheld, the basic premise of a patent is to publicly disclose the invention in exchange for a limited right to prevent unauthorized use of the invention during the patent term. The patentee may voluntarily license the right to use the invention, but absent a license, the only course to address unauthorized use is to sue for infringement, which is "possibly the least efficient way to conduct a financial transaction." *See RPX FAQs*, RPX: RATIONAL PATENT, https://www.rpxcorp.com/faqs (last visited Oct. 9, 2024).

RPX provides a "rational alternative to litigation" for patentees and potential licensees alike. (McCurdy Decl. ¶5.) RPX, acting as principal, enters into transactions that allow patentees to license patents to multiple entities (RPX's operating company Members, whose primary function is to create and sell inventions) rather than the patentee having to approach each potential licensee individually. (*Id.* ¶6.) RPX's business creates a win-win: Patentees can more efficiently monetize their patents and RPX's Members can lessen the friction to innovation while both sides avoid costly litigation and minimize their transaction costs. (*Id.* ¶8.) Over its more than 16 years of operation, RPX's business has achieved over 2,300 dismissals in U.S. district courts,

and RPX estimates having prevented thousands more from entering the court system. (*Id.* ¶6.) Of course, engaging with RPX is purely voluntary for patentees and operating companies alike, and each maintain the option to negotiate bilaterally (*i.e.*, without RPX). (*Id.* ¶5, Exs. A–E.)

In addition to such transactions, RPX facilitates "syndicated transactions" for patent portfolios that are only relevant to a limited set of RPX Members. (*Id.*, Ex. E.) In a syndicated transaction, Members provide funds on top of membership fees to allow RPX to pay patentees for patent rights stemming from the transaction. (*Id.* ¶9.) As principal, RPX concludes a transaction with a patentee and, in turn, sublicenses rights obtained to its Members. (*Id.*) RPX may negotiate the amount a Member contributes to a syndicated transaction, but it does not divulge any Member's confidential information (such as the price that Member may be willing to pay to RPX) to any other Member. (*Id.* ¶10.) As stated in RPX's governing documents: "RPX members are always free to negotiate directly with patent owners (and in fact [RPX] encourage[s] [Members] to do so, as [RPX] always want[s] [Members] to ascertain whether they can get a better deal bilaterally [than in a RPX transaction])." (*Id.*, Ex. E at 7–8.)

**XOCKETS.** According to Plaintiff, Xockets developed technology in the "early 2010s" that purportedly is fundamental to cloud computing and AI. (FAC ¶¶12–13.) Today, Xockets's Portfolio consists of a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[1] (Hanneken Decl. ¶11.) Xockets has not claimed any research, development, or innovation for almost a decade, *Xockets Timeline*, XOCKETS: DATA PROCESSING UNITS, https://www.xockets.com/our-story, and its only business is monetizing its patents (commonly known as an NPE or "non-practicing entity"). (*See* Mot. at 30–32.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[1] A patent "family" is a set of patents related to different aspects of a single invention.

████████████████████ █ ████████████████████████████

████████████████████████

**XOCKETS APPROACHES RPX**. Although Xockets now challenges the RPX model, Xockets sought to take advantage of that model by reaching out to RPX four times in May and June 2024 to discuss Xockets's supposedly "interesting patent portfolio.[3] (McCurdy Decl. ¶¶12–17, Exs. F–H.) RPX did not learn the name of the patentee (*i.e.*, Xockets) or its patent list before Xockets approached RPX. (Hanneken Decl. ¶¶7–8.)

On June 8, 2024, Xockets's IP advisors, Tech+IP, requested a meeting with RPX, (Hanneken Decl. ¶8.) and on June 12, RPX and Xockets met at an industry conference. (*Id.*, Ex. E.) During this meeting, Xockets informed RPX that it required offers ████████████████████ ████████████████████████████ and set a due date of mid-July to execute a transaction (less than one month later). (*Id.* ¶15.) Xockets also informed RPX that while it ████ ████████████████████████████████████ ████████████████████████ (*Id.* ¶14.) Following the only meeting RPX had with Xockets, RPX explored the limited information Xockets provided and evaluated Xockets's patents, giving the patent family a grade of ████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████

---

[2] A NPE such as Xockets has many paths to monetize its patents, if they have value, such as through licensing, litigation, use of a broker, existing auctions, sales.

[3] Xockets incorrectly claims that RPX "suddenly reached out to representatives of Xockets to discuss Xockets' portfolio." (Mot. at 7.) In fact, the undisputed record evidence shows this assertion is false: *Xockets* initiated contact with RPX.



At no point did RPX agree with anyone not to negotiate with Xockets or that RPX would be the exclusive bidder, and at no point was RPX aware of any such agreement between or among anyone. (McCurdy Decl. ¶22; Hanneken Decl. ¶24.) Xockets did not receive an offer from RPX before Xockets sued because its price and timeline were astoundingly unreasonable. (*Id.*)

## **ARGUMENT**

### I.     **Legal Standard**

To obtain a preliminary injunction, a plaintiff must present a *prima facie* case of: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not issued; (3) a threatened injury that outweighs the harm that will result if the injunction is granted; and (4) proof that an injunction is in the public interest. *Big Tyme Invs., L.L.C.* v. *Edwards*, 985 F.3d 456, 463–64 (5th Cir. 2021). "A preliminary injunction is an extraordinary remedy that should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Id.* at 464 (quoting *Dennis Melancon, Inc.* v. *City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012)). "[G]ranting a preliminary injunction is the exception rather than the rule." *Texas* v. *Seatrain Int'l, S. A.*, 518 F.2d 175, 179 (5th Cir. 1975).

### II.    **Plaintiff Does Not Show a Likelihood of Success on the Merits**

To attempt to support its Motion, Plaintiff offers (1) evidence of RPX's business model and (2) the fact that Xockets failed to sell its patents to RPX, NVIDIA, or Microsoft. What Plaintiff has not offered, among other deficiencies, is requisite evidence of an agreement or

plausible inference that an agreement was reached, a restraint of trade in a relevant market, or an antitrust injury.

### A.     PLAINTIFF FAILS TO PROVIDE EVIDENCE OF A CONSPIRACY UNDER SECTION 1 OF THE SHERMAN ACT

"Section 1 is only concerned with concerted conduct among separate economic actors rather than their independent or merely parallel action." *Abraham & Veneklasen Joint Venture* v. *Am. Quarter Horse Ass'n*, 776 F.3d 321, 327 (5th Cir. 2015). Thus, to state a Section 1 claim, a plaintiff must show that a defendant (1) engaged in a conspiracy (2) that restrained trade (3) in a relevant antitrust market. *Id.*; *Golden Bridge Tech., Inc.* v. *Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008). Plaintiff has utterly failed to meet its burden.

**PLAINTIFF FAILS TO PROVIDE EVIDENCE OF A CONSPIRACY.** In assessing the sufficiency of a conspiracy claim, "the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 553 (2007) (citation and quotation marks omitted). To prove conspiracy, or "concerted action," the plaintiff must prove that defendants had "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Golden Bridge* 547 F.3d at 271 (quoting *Monsanto Co.* v. *Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984)). To establish an agreement in support of conspiracy, Plaintiff must provide "[d]irect evidence of a conspiracy," which is evidence that "explicitly refers to an understanding between the alleged conspirators," or circumstantial evidence "tending to exclude the possibility of independent conduct." *Viazis* v. *Am. Ass'n of Orthodontists*, 314 F.3d 758, 762 (5th Cir. 2002) (citation and quotation marks omitted). "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Twombly*, 550 U.S. at 556.

REDACTED PUBLICLY FILED VERSION

Here, Plaintiff relies on cherry-picked statements from an old version of RPX's website as "direct evidence," together with "circumstantial evidence" regarding Plaintiff's failure to monetize its ███ patents on terms it demanded. (Mot. at 11–19.) This is far from sufficient to meet Xockets's burden.

The website statements Xockets cites show no more than RPX's legitimate objective of lowering litigation risk and enabling patent owners to clear multiple licensing deals simultaneously, thus increasing market efficiencies. (McCurdy Decl. ¶6.) Xockets ignores much of the website it cites and misrepresents the passages it does rely on. Far from achieving savings and efficiencies through "fixing" prices, the cited website passages refer to savings by avoiding litigation costs. *See* RPX: RATIONAL PATENT, https://www.rpxcorp.com (last visited Oct. 9, 2024).

Xockets also ignores the repeated RPX written statements that refute Xockets's blatant mischaracterization of RPX's business. As RPX explains, Members and patentees are always free to negotiate bilaterally—which in fact they do even when RPX is in the midst of its own negotiation with the same patent owner. (McCurdy Decl. ¶5, Exs. A–E; Hanneken Decl. ¶4.)

None of the statements Xockets cites "explicitly refer to an understanding" among anyone to negotiate only through RPX, or boycott anyone. These unilateral statements on RPX's website in no way constitute "direct evidence" of a Section 1 conspiracy, and no agency or court has ever concluded otherwise in RPX's 16 years of transparent operation. *See Viazis* 314 F.3d at 762 (a letter "contain[ing] no explicit reference to an agreement" is not direct evidence of a conspiracy).

While Xockets's failure to show even an indicia of parallel conduct should end the inquiry, Xockets also fails to show any circumstantial evidence of a conspiracy or "plus factors." The purported plus factors—supposed actions against self-interest, opportunity, motive, and

REDACTED PUBLICLY FILED VERSION

government investigations—stem from two broad factual assertions: (1) the "refusal" of NVIDIA and Microsoft to negotiate, followed by (2) RPX's "sudden appearance." (Mot. at 14.) But Xockets has ignored uncontroverted facts and misstated others. In fact, the McCurdy and Hanneken declarations submitted herewith show that (i) Xockets sought out RPX to take advantage of the business model it now challenges; (ii) Xockets set parameters for ridiculous pricing and unachievable timing around a patent portfolio RPX rated as ███████████████████████; (iii) RPX offered to continue discussions and explore a possible deal if Xockets changed its timing demand; and (iv) rather than engage in a reasonable process, Xockets brought its meritless claims. Significantly, RPX *never* refused a deal with Xockets or suggested it was the only source of a deal—the nub of Xockets's claim—but only said Xockets's timing was impossible, and RPX offered to continue working towards a deal if Xockets gave RPX more time. A conspiracy cannot be inferred from these facts regardless of how Xockets twists them.

"[C]onduct that is as consistent with permissible competition as with illegal conspiracy cannot support a conspiracy inference." *Abraham*, 776 F.3d at 331 (holding that one-sided complaints and allegations of a "secret meeting" were insufficient to support an inference of a conspiracy as a matter of law because the conduct was also consistent with independent action) (citation and quotation marks omitted). The two broad factual allegations and the accompanying "plus factors" do not allow the inference Xockets asks the Court to draw.

*First*, RPX never refused to do a deal with Xockets and never countermanded its business practice—known to Xockets and its advisors—that Members are always free to negotiate bilaterally. RPX never agreed with anyone to be the exclusive counterparty to a license, and when RPX asked for more time to appraise an offer, Xockets elected to sue.

*Second*, Plaintiff argues that NVIDIA and Microsoft acted "against their clear individual self-interest" by not negotiating directly with Xockets because they "knew the value" of Xockets's Portfolio. Passing the fact that this does not concern RPX, Plaintiff has not alleged any evidence to indicate any such knowledge of value, that Xockets's asking price was reasonable, or even what its asking price was. Indeed, the only evidence of "value" of the Xockets's portfolio is RPX's preliminary assessment that the portfolio had no more value than ███████████

*Third*, RPX did not make a "sudden appearance" or "reach[ ] out to Xockets" (Mot. at 14). The record establishes that *Xockets* sought to take advantage of the RPX model Xockets now challenges by *asking* RPX to a meeting on June 12, and *Xockets* set the terms and conditions of any discussion that might ensue, which included ████████████████████████████████ ███████████████████████████ that must be paid within one month. (McCurdy Decl. ¶¶12–19; Hanneken Decl. ¶¶7–8, 15, 21.)

Xockets's repeated attempts to engage with RPX demonstrate that Xockets reached out to RPX *because of* (not in spite of) the benefits and efficiencies of RPX's transparent business model—well-known to Xockets and Tech+IP. (McCurdy Decl. ¶14; Hanneken Decl. ¶9.) Those efficiencies are well-recognized by antitrust authorities. Both the Department of Justice ("DOJ") and Federal Trade Commission ("FTC") have recognized that clearing multiple licenses in a single transaction may lower transactions costs, avoid costly litigation, and achieve other procompetitive benefits. *Antitrust Guidelines for the Licensing of Intellectual Property*, DOJ and FTC at 16–17 (Jan. 12, 2017) (hereinafter, "IP Licensing Guidelines"); Letter from Joel Klein, Acting Ass't Att'y Gen., U.S. Dep't of Justice, to Garrard Beeney, Partner, Sullivan & Cromwell LLP on behalf of The Trs. of Columbia Univ. et al. (June 26, 1997) at 15–16, https://www.justice.gov/sites/default/files/atr/legacy/2006/10/17/215742.pdf (hereinafter the

"MPEG-2 Letter"); Letter from Makan Delrahim, Ass't Att'y Gen., U.S. Dep't of Justice, to Mark Hamer, Partner, Baker & McKenzie, on behalf of Avanci LLC (July 28, 2020) at 8–9, https://www.justice.gov/atr/page/file/1298626/dl?inline (hereinafter, the "Avanci Letter"); Letter from Michael F. Murray, Acting Principal Deputy Ass't Att'y Gen., U.S. Dep't of Justice, to Garrard Beeney, Partner, Sullivan & Cromwell LLP on behalf of UTLP (Jan. 13, 2021) at 5, https://www.justice.gov/atr/page/file/1352961/dl?inline (hereinafter, the "UTLP Letter"). Plaintiff certainly offers no evidence to suggest such arrangements are somehow *per se* unlawful.

Plaintiff knows that RPX would have to, and did, speak to its Members, on an individual basis, regarding Xockets—not to form a so-called "group boycott," but because Xockets *asked RPX to do so* as part of its standard process to gauge Member interest in a potential syndicated transaction. (Hanneken Decl., Exs. H, G §3(c).) And, Plaintiff is aware that RPX (and its Members) did not make an offer because, as RPX told Xockets, "[g]etting a number by July 11th, ████████████████, [was] not going to happen." (*Id.*)

*Fourth*, Plaintiff attempts to shoehorn into its Motion evidence of unrelated government investigations of NVIDIA and Microsoft as a "plus factor" but cites no decisions or enforcement actions stemming from these investigations that have anything to do with Plaintiff's claims, or that the investigations are related to patent licensing at all. The only (inapposite) case to support relevancy that Plaintiff cites centered on the defendants' "*criminal guilty plea agreements, where [the defendants] individually admit to general . . . price fixing with multiple competitors.*" *Kjessler* v. *Zaappaaz, Inc.*, 2019 WL 3017132, at *11 (S.D. Tex. Apr. 24, 2019) (emphasis added). The Court should disregard this "plus factor."

In sum, none of the circumstantial "plus factors"—even if they are considered in light of there being no evidence of an agreement—overcome the alternative and far more plausible

explanation proven by RPX's contemporaneous emails and affidavits: Xockets asked RPX to pay too much money on too short a timeline, and Xockets was told exactly that, so no deal was done.

**PLAINTIFF FAILS TO PROVIDE EVIDENCE OF A RESTRAINT OF TRADE.** The second requirement under Section 1 is that the alleged behavior unreasonably restrain trade (*i.e.,* competition). While courts have determined certain "naked" restraints are *per se* illegal, potential restraints of trade generally require fact-intensive analyses under the rule of reason. *See* 7 Areeda & Hovenkamp, *Antitrust Law*, ¶1508, p. 368 (5th ed. 2023) (hereinafter, "Areeda & Hovenkamp") (rejecting the premise "that antitrust analysis is governed by three discrete silos denominated 'rule of reason,' 'quick look,' or 'per se'" and noting that "the Supreme Court has never categorically embraced a tripartite 'quick look,' and has expressed some skepticism."); *Texaco Inc.* v. *Dagher*, 547 U.S. 1, 5 (2006) ("[courts] presumptively appl[y] rule of reason analysis" and have "expressed reluctance to adopt '*per se*' rules…where the economic impact of certain practices is not immediately obvious.") (collecting cases) (quotation marks omitted). The rule of reason analysis is appropriate here.

**THE PER SE ANALYSIS DOES NOT APPLY.** A *per se* analysis is only applicable to restraints that have such a "pernicious effect on competition" that they "lack [ ] any redeeming virtue." *MM Steel, LP* v. *JSW Steel (USA), Inc.*, 806 F.3d 835, 848 (5th Cir. 2015), *cert. denied*, 137 S. Ct. 372 (2016) (quoting *United States* v. *Gen. Motors Corp.*, 384 U.S. 127, 146 (1966)). Plaintiff's analysis falls far short of this requirement, and Plaintiff has the analysis backwards.

Under Xockets's theory, the *per se* rule applies because RPX seeks lower licensing costs for its Members. Thus, Xockets asserts, there must be *per se* price fixing. (Mot. at 20). But the *per se* rule is not self-defining, and just because a practice may achieve price efficiencies does

not mean that there was "price fixing" that qualifies for *per se* treatment. 7 Areeda & Hovenkamp ¶1510, at 402. Before the *per se* rule is applied, the Supreme Court requires an analysis of market power and whether the practice has legitimate objectives. *Broad. Music, Inc.* v. *Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19–20 (1979) (the crux of the inquiry is "whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, and in what portion of the market, or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive'" (quoting *United States* v. *U.S. Gypsum Co.*, 438 U.S. 422, 441 n. 16 (1978)) (additional citations omitted))[4] This is so "even [for] conduct that rather obviously fixes a price[, which] may be classified outside the per se rule." 7 Areeda & Hovenkamp ¶1510(c), at 409. The Motion does not even attempt any analysis of whether the assumed "price fixing" meets these requirements; it does not.

*First,* the DOJ and FTC, as noted, have recognized that IP licensing arrangements, including patent pools and other joint licensing activities similar to RPX, facilitate procompetitive benefits. *See* Section II.A supra. As explained *supra* and in the accompanying declarations, RPX facilitates the same kinds of procompetitive benefits recognized by the agencies. These benefits, alone, nullify *per se* treatment.

---

[4] Moreover (i) Xockets has not shown that the products for which it compares prices—multiple licenses in an RPX single large transaction with individual one-off licenses with Microsoft and NVIDIA—are comparable. It is logical that a patentee would be willing to accept less per licensee if it is able, *e.g.*, to license to multiple companies in a single, consensual transaction than a license to one company alone; (ii) there is no proof that an RPX transaction will always result in a lower cost (indeed, RPX makes plain the possibility that operating companies may be able to achieve better results bilaterally (McCurdy Decl., Ex. C at 5–6)); and (iii) any patentee seeking out RPX—as Xockets did—is free to walk away from any deal RPX offers and seek a bilateral license without any ability of RPX to stop it—a fact pattern that happens regularly. (McCurdy Decl. ¶5; Hanneken Decl. ¶4, Ex. G §6.)

*Second*, RPX has no "market power" from which to "fix prices." Plaintiff cites no evidence for why the claimed relevant market is limited to "Xockets' Patents" (which is nonsense), or why Microsoft, NVIDIA and RPX are the only potential buyers for its patents. *See Apani Sw., Inc.* v. *Coca-Cola Enter., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002) (explaining that an antitrust market generally consists of the "product" at issue and all reasonable "substitutes for it"). Plaintiff has not (1) disclosed the universe of other operating companies it approached who would be in the market for Xockets's attempt to sell itself; (2) explained why only companies that use DPUs for "GPU-enabled AI platforms" (and not companies using DPUs for other purposes such as data analytics, video transcoding and streaming, and network traffic processing), are potential buyers; (3) explained why *only* NVIDIA is the lone chip maker that could buy its patents, or (4) explained why the NPEs it approached during its sale process are suddenly not reasonable substitutes for the sale. (Hanneken Decl. ¶14, Ex. F.) For these reasons, *per se* analysis is not applicable to Xockets's claims.[5]

**RULE OF REASON ANALYSIS.** The IP Licensing Guidelines explain that "[i]n the vast majority of cases, restraints in intellectual property licensing agreements are evaluated under the rule of reason." IP Licensing Guidelines at 16–17. Implementing this principle, the DOJ has issued Business Review Letters stating that under the rule of reason, the IP licensing agreements detailed in those letters are not anticompetitive. In 2020, the DOJ issued a Business Review Letter to Avanci LLC ("Avanci") and identified the Avanci licensors retaining the right to independently license outside the platform and its measures to protect the sharing of competitively sensitive information as key factors for issuing the Letter. Avanci Letter at 5–6. The DOJ explained

---

[5] To the extent this Court would apply an analysis akin to a "quick look," Plaintiff fails to show a restraint of trade under such an abbreviated analysis for the same reasons.

that it has "long recognized that patent pools can provide procompetitive benefits by integrating complementary technologies, reducing transaction costs, clearing blocking positions, and avoiding costly infringement litigation." *Id.* at 8 (citation and quotation marks omitted). To put it succinctly, because "patent pools can significantly reduce transaction costs for both licensors and licensees and lead to the more efficient exploitation of the intellectual property, the [DOJ] evaluates them under the rule of reason." *Id.* at 9 (citation and quotation marks omitted).

In 2021, the DOJ issued another relevant Business Review Letter, regarding the University Technology Licensing Program ("UTLP"), and came to the same efficiency conclusions even though UTLP requires members to commit to exclusively license their patents to UTLP. UTLP Letter at 5. The rule of reason was *still* applicable because UTLP proposed competitive safeguards, *id.*, and, on balance, was unlikely to harm competition. *Id.* at 14.

While RPX is not a licensor-organized patent pool, the challenge to its business raised by Xockets is subject to a rule of reason analysis for the same reasons as Avanci, UTLP and other joint licensing arrangements: RPX offers a multitude of procompetitive benefits, including facilitating potential volume discounts, reduced transaction costs, better business planning, non-exclusive participation, and reduced litigation. Indeed, Plaintiff offers no competent evidence or precedent of any RPX supposed anticompetitive effects and, instead, relies on vague, generalized, illogical and unsupported contentions. (Mot. at 22–23.)

Even if any of the harms imagined by Xockets were cognizable or supported (they are not), RPX's structure eliminates any reasonable concern of competitive harm. For example, RPX's "syndicated transactions are optional and non-exclusive," meaning that RPX Members (1) are not required to participate and (2) as set out in Member's agreements, are always free to "negotiate separate licenses for any patents, at any time, with any third-party patent owners" rather

than take part in a syndicated transaction. (Hanneken Decl. ¶¶3–4, Exs. A–C.) Furthermore, nothing about RPX's business prevents patent owners who are unable to come to a satisfactory agreement from alleging infringement in court, as Xockets *is currently doing*. If a patent owner or potential licensee is unhappy with the RPX alternative, they are free to seek other arrangements. There is no foreclosure or other market impact from the alternative monetization opportunity RPX offers. RPX does not constitute any restraint on trade, let alone an unreasonable one.

**THE CASCADES DECISION SUPPORTS DENIAL OF A PRELIMINARY INJUNCTION.** Throughout its Motion, Plaintiff cites and then mischaracterizes the 2013 opinion in a Sherman Act case, *Cascades Computer Innovation LLC* v. *RPX Corp.*, 2013 WL 6247594 (N.D. Cal. Dec. 3, 2013). This unpublished opinion does not come close to supporting Plaintiff's Motion. *First,* that plaintiff in *Cascades* survived a motion to dismiss has little bearing on whether Xockets has met its burden to show a "substantial likelihood of success on the merits," such that Xockets should be granted the "extraordinary remedy" of a preliminary injunction. *See* Section I, *supra*.

  *Second*, the facts here are unlike those in *Cascades*, in which the plaintiff alleged (1) that RPX withdrew from an agreed price; and (2) that an RPX Member stated "it preferred to negotiate through RPX"—all of which the *Cascades* court had to accept as true given the procedural posture of the motion the court resolved. *Cascades* 2013 WL 6247594 at 7, 17. Plaintiff has alleged no similar facts here because there are none.

  *Third*, in *Cascades* the District Court *sua sponte* stayed the antitrust claims pending resolution of the merits of the patent infringement claims. Once the infringement claims failed, the court dismissed the antitrust case on the pleadings. *Cascades Computer Innovation, LLC* v. *RPX*

*Corp.*, 719 F. App'x 553 (9th Cir. 2017) (affirming that patent owner had no antitrust injury without proving infringement).

Following this logic, the Court may deny Xockets's Motion because Plaintiff has failed to argue, let alone prove, that it is likely to prevail on the merits of its patent infringement claims.

### B. PLAINTIFF FAILS TO SHOW ANY LIKELIHOOD OF SUCCESS ON ITS SHERMAN ACT SECTION 2 CLAIM

To establish a conspiracy to monopolize under Section 2 of the Sherman Act, a plaintiff must show "(1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce." *Stewart Glass & Mirror, Inc.* v. *U.S. Auto Glass Disc. Centers, Inc.*, 200 F.3d 307, 316 (5th Cir. 2000) (citation omitted). Plaintiff's Section 2 claim unequivocally fails each prong. And, even more fundamentally, courts have rejected Xockets's argument—namely, that RPX, NVIDIA and Microsoft have a "shared monopoly" of purchasing power—as "paradoxical" and "outside the bounds of [Section 2]." *See*, *e.g.*, *Acad. of Allergy & Asthma in Primary Care* v. *Quest Diagnostics, Inc.*, 2022 WL 980791, at *9 (W.D. Tex. Mar. 31, 2022).

*First,* as explained in Sections II.A *supra*, Plaintiff has failed to show "any agreements or conspiracies, anti-competitive or otherwise, between" RPX, Microsoft, and NVIDIA, and "this lack of evidence is fatal." *Stewart Glass & Mirror*, 200 F.3d at 316; *see also NYNEX Corp* v. *Discon, Inc.*, 525 U.S. 128, 139-40 (1998) (Section 2 conspiracy claim must fail because it relied on the same facts as a failed Section 1 anticompetitive agreements claim). *Second,* as explained in Section II.A *supra*, Plaintiff's specious evidence of overt acts is not just factually wrong—Plaintiff pursued RPX as a potential buyer of its business or patents, not the other way

around (Hanneken Decl. ¶6, Exhibit B.)—but it also is legally insufficient. Plaintiff has failed to demonstrate that these actions were not simply legitimate business decisions, and where two explanations are equally plausible, a "tie" goes to Defendants. *Stewart Glass & Mirror, Inc.*, 200 F.3d at 315 (citing *Matsushita Elec. Indus. Co.* v. *Zenith Radio*, 475 U.S. 574, 587 (1986)). *Third*, Plaintiff does not even attempt to explain how a company with no claimed profit, revenue, or ongoing business activity (Xockets) selling or licensing its patent portfolio for less than it wants affects interstate commerce. *Fourth*, Plaintiff's claim of specific intent is also factually incorrect because, as Mr. Hanneken explains, in RPX's syndicated transactions, "Members are free to negotiate with RPX for a sublicense as part of a potential syndicated transaction or negotiate bilaterally directly with the patent owner for a license (or do both in parallel)." (Hanneken Decl. at ¶3.) In fact, Members frequently enter into bilateral licenses, including when RPX is negotiating with the same patent owner. (*Id.* at ¶4; McCurdy Decl. ¶5.) Moreover, the DOJ has "long recognized" that joint licensing arrangements, such as RPX, "can provide procompetitive benefits by integrating complementary technologies, reducing transaction costs, clearing blocking positions, and avoiding costly infringement litigation." Avanci Letter at 8 (citation and quotation marks omitted). Plaintiff's Section 2 claim fails.

## C. THERE IS NO EVIDENCE PLAINTIFF SUFFERED ANTITRUST INJURY

In order to establish an antitrust violation, there must be evidence that the anticompetitive behavior has resulted in an actual injury of the kind the antitrust laws mean to prevent. *Stewart Glass & Mirror, Inc.*, 200 F.3d at 312 ("[A]ntitrust plaintiffs must prove they have suffered an injury stemming from the complained-of anti-competitive behavior") (citing *Matsushita*, 475 U.S. at 586); *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (same: "The injury should reflect the anticompetitive effect.").

Plaintiff has failed to plausibly allege any injury *at all*, let alone one related to an antitrust violation by RPX. While Plaintiff alleges that "its inability to license its patents at fair market rights [sic] . . . has depressed the company's value, discouraging potential buyers" (Mot. at 32), Plaintiff offers no evidence to show how much it has ever been worth, who these "potential buyers" are (apart from the parties being sued), what offers Plaintiff has received, or how a lower purchase price vis-à-vis a lower company value has discouraged potential buyers. Neither has Xockets alleged what its patents are actually worth, only that they are "highly" or "undeniably" valuable. (Mot. at 2, 29.) Xockets's omission is particularly egregious given Xockets admitted to RPX ███████████████████████████████████████████ (Hanneken Decl. ¶12). There is simply no evidence that any action taken by RPX, Microsoft, or NVIDIA actually caused Xockets's patents to sell for or be valued at a concrete and objectively verified below-market price (or, in this case, not sell at all) because there is no evidence of what Xockets's patents are actually worth, if anything. Until Xockets is able to show an injury through infringement of the patents it asserts, it fails to show any harm at all. *See Cascades Computer Innovation, LLC*, 719 F. App'x at 555 ("Because the defendants did not infringe the [patent], Cascades' failure to license the patent was not a cognizable antitrust injury.").

## D. PLAINTIFF FAILS TO SHOW IRREPARABLE HARM

Even if Xockets could prove an injury, all of the harms Xockets alleges based on patent infringement are purely economic and thus, by definition, can be monetarily remedied. (Mot. at 30 (citing *Interox Am.* v. *PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir. 1984) ("An injury is irreparable if it cannot be undone through monetary remedies."))).) Plaintiff's key allegation of harm resulted from a supposed agreement related only to the disposition of Xockets's patents, meaning that the only appropriate remedy, were Xockets to ever prevail on its outlandish claims, would be monetary compensation for the value of the patents themselves. If the patents are worth

something now and Xockets prevails, the patents will still exist and still have value. It is unclear

what benefit Xockets will gain from its requested relief, since the only harm Plaintiff claims is not

being able to license or sell its patents, and Plaintiff has not requested (nor could it request) that

this Court force one of the Defendants to license or purchase its patents.

Plaintiff makes the halfhearted claim that its failure to license or sell its ████

patent portfolio (issued nearly a decade ago) to Microsoft, NVIDIA, or RPX will "eventually drive

Xockets out of business." But this *ipse dixit* claim is baseless in light of Xockets apparently having

no business other than monetizing its patents through infringement litigation or licensing to many

others. Indeed, Xockets has alleged no facts to suggest when or how its business will supposedly

fail, including that its business is currently anything more than an NPE (*see* Statement of Facts,

*supra*) with zero revenue or profits. This distinguishes the cases cited by Plaintiff where the

"patentee 'relie[d] heavily on the ability to license its intellectual property to finance its research

and development.'" (Mot. at 31 (citing *Commonwealth Sci.* v. *Buffalo Tech. Inc.*, 492 F. Supp. 2d

600, 604, 608 (E.D. Tex. 2007)).)

### E.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGHS AGAINST A PRELIMINARY INJUNCTION

As discussed extensively *supra*, Xockets utterly has failed to show any agreement

related to its patents. But even if it had, the injunction sought by Xockets should not issue because

it provides little, if any, benefit to Xockets or anyone else. By contrast, issuing an injunction may

cause third parties to question RPX's business model and harm RPX. If RPX operations—which

have served the market uninterrupted for 16 years—are suddenly cast into doubt by an injunction,

RPX will lose immeasurable business and goodwill. (*See* Mot. at 32. ("The 'loss of potential

[business] partners and business opportunities' is difficult to measure and thus can constitute

irreparable injury.") (citing to *Proofpoint, Inc.* v. *Boone*, 2021 WL 5194724 (W.D. Tex. Sept. 21,

2021), report and recommendation adopted, 2021 WL 7184208 (W.D. Tex. Nov. 4, 2021).) Unlike Plaintiff, RPX *has* clients, provides services, and regularly transacts with third parties. Plaintiff's lawsuit and the baseless public accusations of unlawful and conspiratorial conduct Xockets is spreading harm to RPX's business. (McCurdy Decl. ¶¶23–25).[6] The loss to RPX caused by these accusations (and Plaintiff's Motion if granted) is not a simple calculation and will be immensely more difficult to ascertain after the fact. The potential harm to RPX far outweighs any harm to Plaintiff in denying its Motion.

The injunction sought by Xockets does nothing to achieve its goal of monetizing patents, and the injunction Xockets seeks will also be adverse to the public interest. RPX's business facilitates procompetitive efficiencies that broadly benefit the public by reducing transaction costs and costly litigation, and avoiding unnecessary litigation. Plaintiff's cited cases discuss restraining the disclosure of a trade secret and immunizing fixed commission rates used by the New York Stock Exchange are entirely inapposite. *See Union Carbide Corp.* v. *UGI Corp.*, 731 F.2d 1186, 1192 (5th Cir. 1984); *Gordon* v. *N.Y. Stock Exch., Inc.*, 422 U.S. 659, 692 (1975) (Douglas, J., concurring).

## <u>CONCLUSION</u>

Based on the foregoing, RPX respectfully requests that Plaintiff's Motion for a Preliminary Injunction be DENIED.

---

[6] For an example of one of Plaintiff's numerous interviews, *see Robert Cote on Xockets, Inc. Lawsuit Against Nvidia, Microsoft, RPX Corp.,* BLOOMBERG'S "THE CLOSE," (Sept. 24, 2024) available at https://www.xockets.com/media.

DATED: October 9, 2024                     Respectfully submitted,

                                            /s/ *Deron Dacus*
                                           Deron R. Dacus
                                           Texas Bar No. 00790553
                                           THE DACUS FIRM, P.C.
                                           821 ESE Loop 323, Suite 430
                                           Tyler, Texas 75701
                                           Telephone: (903) 705-1117
                                           E-mail: ddacus@dacusfirm.com

                                           Garrard R. Beeney (*pro hac vice*)
                                           Steven L. Holley (*pro hac vice*)
                                           SULLIVAN & CROMWELL LLP
                                           125 Broad Street
                                           New York, NY 10004
                                           Telephone: (212) 558-4000
                                           beeneyg@sullcrom.com
                                           holleys@sullcrom.com

                                           Adam S. Paris (*pro hac vice*)
                                           Caroline M.L. Black (*pro hac vice*)
                                           SULLIVAN & CROMWELL LLP
                                           1888 Century Park East
                                           Los Angeles, CA 90067
                                           Telephone: (310) 712-6600
                                           parisa@sullcrom.com
                                           blackcar@sullcrom.com

                                           ATTORNEYS FOR DEFENDANT
                                           RPX CORPORATION

REDACTED PUBLICLY FILED VERSION

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of October 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will electronically mail notification of such filing to all counsel of record who have appeared in this case.


/s/ *Caroline M. L. Black*
Caroline M. L. Black